# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-1459/1625

_____

United States of America,                          *
                                                   *
    Appellee/Cross-Appellant,                *
                                                   *
    v.                                        *
                                                   *
Mathias Pizano,                                    *
                                                   *
    Appellant/Cross-Appellee.                *


_____

Nos. 04-1591/1835

_____

Appeals from the United States
District Court for the
Southern District of Iowa.


United States of America,                          *
                                                   *
    Appellee/Cross-Appellant,                *
                                                   *
    v.                                        *
                                                   *
Celia Pizano,                                      *
also known as Celia Gallardo                       *
                                                   *
    Appellant/Cross-Appellee.                *

_____

Nos. 04-1592/1682
_____

United States of America,           *
                                     *
     Appellee/Cross-Appellant,       *
                                     *
v.                                   *
                                     *
Jessica Pizano, also known as        *
Jessica Pizano-Cruz,                 *
                                     *
     Appellant/Cross-Appellee.       *

_____

Submitted:  December 15, 2004
Filed:  August 31, 2005
_____

Before BYE, HANSEN, and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

This appeal involves three related defendants.  Mathias Pizano and Jessica Pizano are brother and sister.  Celia Pizano is their mother.

Mathias, Jessica and Celia were convicted on all counts of a twenty-count indictment.  After a lengthy trial, a jury found Mathias, Jessica and Celia guilty of one count of conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957 (Count 20).  In addition to their money-laundering convictions, Mathias, Jessica and Celia were convicted of the following:  Mathias

-2-

was convicted of one count of conspiracy to distribute controlled substances (cocaine and marijuana) in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) and 841(b)(1)(B) (Count 1), two counts of making false statements to a financial institution in violation of 18 U.S.C. § 1014 (Counts 13 and 16), and three counts of engaging in transactions in criminally derived property in violation of 18 U.S.C. § 1957 (Counts 14, 17 and 18); Jessica was convicted of three counts of bank fraud in violation of 18 U.S.C. § 1344 (Counts 8, 9 and 11) and two counts of engaging in transactions in criminally derived property in violation of 18 U.S.C. § 1957 (Counts 10 and 12); and Celia was convicted of five counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 2, 3, 4, 5 and 15), two counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 6 and 7) and one count of engaging in transactions in criminally derived property in violation of 18 U.S.C. § 1957 (Count 18).

With respect to Mathias, the district court imposed concurrent sentences of 360 months' imprisonment on Counts 1, 13 and 16; 240 months' imprisonment on Counts 19 and 20; and 120 months' imprisonment on Counts 14, 17 and 18. As to Jessica, the district court imposed concurrent sentences of 121 months' imprisonment on Counts 8, 9, 11 and 20, and 120 months' imprisonment on Counts 10 and 12. Lastly, with respect to Celia, the district court imposed concurrent sentences of 151 months' imprisonment on Counts 2, 3, 4, 5, 6, 7, 15 and 20, and 120 months' imprisonment on Count 18.

All three defendants appeal their convictions and sentences on various grounds, and the Government has cross-appealed with respect to two sentencing issues. For the reasons discussed below, we affirm the convictions. We also affirm Jessica's and Celia's sentences. However, we vacate Mathias's sentence and remand for resentencing.

# I. BACKGROUND

The factual background of this case dates back to 1992. Due to the volume and complexity of the facts involved, related facts will be grouped accordingly.

## A. In General

Jessica is the mother of five children. She worked as a laborer for Oscar Mayer in Davenport, Iowa. Her tax returns show adjusted gross income of about $26,000 in 1991 to approximately $46,000 in 2001. Her husband, Fernando Cruz, filed no tax returns from 1991 through 2001, except for 1998 when he filed jointly but reported no income.

Celia applied for and obtained two separate Social Security numbers–one under the name of Celia Gallardo and the other under the name of Celia Pizano. In 1985, using the Gallardo name and Social Security number, Celia applied for Supplemental Security Income based on her claimed inability to work and lack of assets. She received monthly payments from the Social Security Administration.

Mathias's reported income in 1991 and 1992 was $2,940 and $6,146.70, respectively. In 1994, he reported income of $5,876.39. In 1993 and from 1995 to 2002, Mathias had no reported income and filed no tax returns.

In 1998, Mathias and Randy Husky became partners in a retaining-wall business they called "National Retainment Systems." They did a few jobs, but the next year, they ended their partnership. However, Mathias continued to use the National Retainment Systems name and bank account for his own criminal purposes.

In 2000, Mathias and Celia (using the name Celia Pizano) opened the Caliente Restaurant in Bettendorf, Iowa. The restaurant was in operation from early 2000 until

the end of 2001. It was not profitable, reporting sales of $22,395 during that period. Nevertheless, an analysis of the bank account for the restaurant showed cash deposits of over $50,000 and total deposits of over $74,000.

## B.    Drugs and Automobiles

In 1992, Mathias, Jessica and Celia were living in Moline, Illinois. Mathias resided at 160 Fourth Avenue. Jessica, Celia and other family members resided at 162 Fourth Avenue, which was jointly owned by Mathias, Jessica, their sister Jennifer and Celia. In November 1992, Mathias conveyed his residence at 160 Fourth Avenue to Jessica. However, Jessica paid no money in the transaction and did not reside in the house.

On May 9, 1992, the Moline Police Department received reliable information that there would be a drug party at 160 Fourth Avenue. Mathias was hosting a party for a drug dealer who had been sentenced and would be leaving for prison. Several known drug dealers, such as Fernando Castillo, were present at the party. The police officers obtained a search warrant and raided the house. Mathias and another drug dealer fled the residence through the back of the house. Mathias escaped to his family's house next door. The police found one ounce of powder cocaine in Mathias's laundry room and $2,600 in a bag in Mathias's bedroom. The police told Jessica that drugs were found at Mathias's house and that they were looking for him. Mathias was charged in state court with possession of cocaine. Celia posted his $5,000 bond, and the charge against Mathias was later dropped. However, Fernando Castillo and another were convicted on the charge.

Rafael Martinez and Mathias grew up in the same neighborhood and were friends. In 1992, at the time of the party, Martinez was a drug dealer, and he and Mathias possibly discussed drug dealing activities with each other. Martinez thought that Castillo looked up to Mathias, describing Castillo as Mathias's "lackey."

Jonathan Reyes lived in Moline. Reyes initially bought marijuana from Castillo, and he believed Mathias was Castillo's source. In 1996 or 1997, Reyes began purchasing marijuana from Mathias, and in 1997 or 1998, he also began purchasing cocaine. Mathias would always "front" the drugs to him, meaning that Mathias would give Reyes the marijuana or cocaine, and Reyes would sell some and keep some for himself and then pay Mathias back with the proceeds of his own drug sales. This continued until February 2002, just before Mathias's arrest.

Jose Leal and Gilbert Quijas distributed cocaine and marijuana to Mathias beginning in 1997 until around 2000. They delivered approximately 8 to 10 kilograms of cocaine and 150 pounds of marijuana to Mathias during that time. On three occasions, Mathias paid Leal for drugs with vehicles–a 1993 Nissan Pathfinder,[1] a 1995 Chevy Tahoe and a 1991 Chevy Blazer. When Leal received the vehicles, the titles to the Pathfinder and Tahoe were in Celia's name. County title records indicated that Celia received the Chevy Tahoe as a gift from her son and that Jose and Rosemary Leal purchased the car from Celia for $14,000.

After Leal had problems collecting from Mathias, Leal's source, Juan Ledesma, began dealing with Mathias directly. Mathias then met Salvador Ramos-Santos through Ledesma. After Ledesma was arrested in February 2000, Ramos-Santos and Mathias agreed that he would sell drugs to Mathias. Between February 2000 and March 2001, Ramos-Santos sold approximately two and one-half kilograms of cocaine and 150 pounds of marijuana to Mathias.

On April 2, 2001, officers of the Quad City Metropolitan Enforcement Group, a drug enforcement agency, caught Ramos-Santos in a Mazda MX-6 with approximately twenty pounds of marijuana in the trunk. The previous owner of the

---

[1]Mathias had purchased the Pathfinder with approximately $8,000 cash, which he gave to the seller in a brown paper bag.

vehicle was Kristine Martens. Martens was Mathias's live-in girlfriend. Mathias used the Mazda MX-6 to pay Santos for ten to twelve pounds of marijuana.

Ramos-Santos consented to a search of his residence in Bettendorf where an additional thirty-nine pounds of marijuana was seized from a box in a pick-up truck. The police founds handwritten notes that reflected drug quantities and dollar amounts. These drug ledgers identified Mathias, Michael Pizano[2] and others as customers. Cellular telephone records found in the house showed calls placed to the telephones of Mathias and Michael Pizano.

The police also found a 1996 Chevrolet pick-up truck registered to Mathias at Ramos-Santos's residence. Mathias purchased the truck from a local Ford dealer on September 11, 2000, for $16,846.50 using a check drawn on the account of Mathias Pizano, doing business as National Retainment Systems. In December 2000, Mathias used the truck to pay Ramos-Santos for approximately twenty pounds of marijuana.

On March 5, 2002, federal agents and police executed a search warrant for Mathias's home. In the garage, the police found one pound of marijuana, a drug scale and plastic baggies. Mathias's fingerprint was found on the plastic bag containing the marijuana. Two semi-automatic pistols were found in the residence–one in a duffel bag by Mathias's bed and the other in a closet. The guns were identified by Leal and Ramos-Santos as ones shown to them by Mathias during drug transactions.

---

[2]Michael Pizano is Jessica's son. He lived with Jessica. Testimony at trial indicated that he sold drugs out of their house. A neighbor even testified that, based on the amount of traffic and the frequent comings and goings of people at the house, she thought drug activity was occurring at the house. Michael Pizano was charged with drug conspiracy. He pled guilty and is not a party to this appeal.

## C. Real Estate Purchases

In 1993, Mathias decided to move from Moline, Illinois to Iowa. He located a home in the 800 block of Grant Street ("Grant Street") in Bettendorf, Iowa. Mathias made an offer to purchase the Grant Street home, subject to successfully closing on the sale of the property located at 160 Fourth Avenue in Moline, which he claimed to own. Mathias closed on the purchase of Grant Street soon after the sale of the Moline property and placed the deed to the Grant Street home in Jessica's name. Mathias moved into the Grant Street home.

In August 1995, Jessica applied for a loan with Mercantile Bank and used the Grant Street property as collateral. On August 25, 1995, she met with a loan officer, and together they completed a residential loan application. On the form, Jessica stated that she was the sole owner of the property located at 162 Fourth Avenue in Moline. She also listed the value of 162 Fourth Avenue at $65,000. In a separate letter, she explained that the purpose of the loan was to obtain funds to purchase a home for Mathias in San Antonio, Texas and that she was going to move into the Grant Street home. In another letter dated October 13, 1995, she stated that Mathias had taken a job in Texas. On October 26, 1995, Jessica signed a typewritten final loan application that reiterated the information she previously provided. The bank approved the loan. On October 31, 1995, loan proceeds in the amount of $65,811.02 and $9,000 in cash were deposited into Jessica's bank account at IH Mississippi Valley Credit Union ("IHMVCU").

Meanwhile, Mathias was planning on purchasing a home located at 2225 Parkway Drive ("Parkway") in Bettendorf, Iowa, not Texas. He contacted a real estate agent and negotiated the purchase of Parkway for approximately $72,000. However, Mathias used Jessica's name in the offer to purchase the home, and the deed was placed in her name. In addition, one week after the loan proceeds from the Grant Street refinancing were deposited into Jessica's IHMVCU bank account, they

were used to purchase Parkway. Mathias moved into Parkway, and Jessica and her family moved into the Grant Street home.

In 1997, Mathias sought more real estate, this time in California. He traveled to the Huntington Beach area and met with a realtor. After looking at properties, Mathias decided to buy a condominium located at 310 Lake Street ("Lake Street"). However, Jessica applied for the loan to purchase the property.

The realtor referred Jessica to Larry Rochelle, a real-estate loan broker. Rochelle corresponded with Jessica by telephone and mail to complete a loan application to World Savings Bank. In statements made by Jessica to Rochelle and in the loan application and supporting materials submitted to World Savings Bank, Jessica represented that the down-payment for the purchase of Lake Street was to be provided to her as a gift from her father. She submitted to the bank two gift letters signed by her father, Matias Pizano ("Mr. Pizano")–one in the amount of $15,000 and one in the amount of $35,000.

Mathias and Jessica both contacted Mr. Pizano to ask for money for the purchase of Lake Street. Mr. Pizano testified that although he signed a $15,000 gift letter, he agreed to loan them $7,700 for the purchase of Lake Street. He also testified that he did not sign the $35,000 gift letter that Jessica submitted to World Savings Bank.

World Savings Bank approved Jessica's loan for the purchase of Lake Street. The loan amount was $104,300. The deed to the Lake Street condominium was placed in Jessica's name.

During the weeks prior to closing on the Lake Street condominium, more than $30,000 in cash was deposited into Jessica's IHMVCU bank account. The deposits

were made in increments under $10,000, except for a single deposit of $10,800.[3] The manner of these deposits is significant: (1) on October 30, 1997, a deposit of $7,500 cash was made to Celia's IHMVCU account which was then used to purchase a cashier's check payable to Celia and Jessica; (2) on the same day, Celia purchased another $7,500 cashier's check from Mercantile Bank made payable to Jessica; (3) on November 1, 1997, a deposit of $5,350 cash was made to Jessica's IHMVCU account; (4) on November 4, 1997, the $7,500 cashier's check from Mercantile Bank was deposited into Jessica's IHMVCU account; (5) on November 5, 1997, the other $7,500 cashier's check was paid directly to Tiempo Escrow Inc. and applied toward the purchase of Lake Street; and (6) on November 5, 1997, a check in the amount of $40,500 drawn on Jessica's IHMVCU account was paid to Tiempo Escrow Inc. for the purchase of Lake Street.

About a year after the purchase of the Lake Street condominium, Mathias approached the same Huntington Beach realtor about purchasing more property in the area. Mathias decided on a condominium located at 200 Pacific Coast Highway (the "PCH condominium"). The agreed upon purchase price was $190,000. Once again, after Mathias performed all of the leg work, Jessica was substituted to close the deal in her name. As in the Lake Street deal, she was referred to World Savings Bank to obtain financing. And again, to explain the source of the down-payment of approximately $53,000, she submitted a $30,000 gift letter signed by her father. Mr. Pizano, however, testified that he neither agreed to give nor gave money to Jessica

---

[3]Internal Revenue Service special agent Brian Berntsen testified about the concept of "structuring." He explained that when an individual conducts a transaction at a bank that involves more than $10,000, the bank is required to file a currency transaction report with the IRS. The report details, for example, the name and address of the individual who conducted the transaction and the denominations of the currency involved. Structuring occurs when an individual attempts to circumvent the reporting requirement by conducting separate transactions in amounts of less than $10,000.

for the purchase of the PCH condominium. He also testified that he did not sign or have any knowledge of the $30,000 gift letter.

To come up with the necessary funds for the PCH down-payment, several thousand dollars in cash or cashier's checks were deposited into Jessica's bank accounts in increments under $10,000 over a period of a couple of months. The record shows the following: (1) on September 14, 1998, a deposit of $8,000 cash was made to Jessica's Mercantile Bank account; (2) on September 23, 1998, a deposit of $7,500 cash was made to Jessica's Mercantile Bank account; (3) on September 28, 1998, another deposit of $7,500 cash was made to Jessica's Mercantile Bank account; (4) on September 30, 1998, a deposit of $9,500 cash was made to Celia's IHMVCU account, and on the same day, Celia purchased a cashier's check at the IHMVCU made payable to her and Jessica in the amount $9,500; (5) also on September 30, 1998, Jessica issued a check on her IHMVCU account to Celia in the amount of $6,966, and on the same day, Celia cashed the check; (6) on October 1, 1998, Jessica deposited the $9,500 cashier's check from IHMVCU and $6,966 cash into her Mercantile Bank account; and (7) on October 2, 1998, a wire transfer in the amount of $53,450 was made from Jessica's Mercantile Bank account to the escrow agent in California for the purchase of the PCH condominium.

Finally, on November 21, 2001, Mathias purchased property at 1831 Christie Street in Davenport, Iowa (the "Christie Street property" ). On the date of the sale, Celia used cash to purchase a $6,500 cashier's check at the First National Bank in Bettendorf, Iowa. She also purchased a $5,767.44 cashier's check at a different bank. Mathias used the two checks to purchase the Christie Street property.

## II. DISCUSSION

### A. Trial Issues

#### 1. Mathias Pizano

##### a. Sufficiency of the Evidence

Mathias argues that the evidence produced at trial by the Government is insufficient to support his conviction for conspiracy to distribute cocaine and marijuana in violation of 21 U.S.C. § 846. We reject this argument.

"Sufficient evidence exists to support a verdict if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jiminez-Perez*, 238 F.3d 970, 972 (8th Cir. 2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The standard for reviewing a claim of insufficient evidence is strict, and a jury's guilty verdict should not be overturned lightly. *Id.* at 972-73.

Mathias contends that the evidence, at most, establishes a series of buyer-seller relationships with Reyes, Leal, Quijas, Ramos-Santos and Ledesma, rather than the existence of ongoing agreements to sell drugs. In order to convict Mathias of conspiracy to distribute drugs, the Government needed to prove that: (1) a conspiracy existed; (2) Mathias knew of the conspiracy; and (3) he knowingly became part of the conspiracy. *See United States v. Crossland*, 301 F.3d 907, 913 (8th Cir. 2002). "To establish the existence of a conspiracy the government needed to prove that there was an agreement among individuals to achieve an illegal purpose." *Id.* Proof of a formal, explicit agreement is not necessary; rather, "[t]he government need only show that those involved operated pursuant to a common

scheme or had a tacit understanding . . . ." *United States v. Mickelson*, 378 F.3d 810, 821 (8th Cir. 2004). Mere proof of a buyer-seller agreement without any prior or contemporaneous understanding does not support a conspiracy conviction because there is no *common* illegal purpose: "In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell." *United States v. Prieskorn*, 658 F.2d 631, 634 (8th Cir. 1981) (quoting *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir. 1978)) (internal quotation omitted).

After having carefully reviewed the record in the light most favorable to the verdict, we reject Mathias's argument that the evidence merely established the existence of a series of buyer-seller relationships with Reyes, Leal, Quijas, Ramos-Santos and Ledesma. The record is replete with evidence of distribution of large amounts of marijuana and cocaine over a significant period of time. *See United States v. Finch*, 16 F.3d 228, 231 (8th Cir. 1994) (noting that evidence of distribution of large amounts of drugs over a significant period of time does not support a defendant's requested jury instruction that proof of a buyer-seller relationship is insufficient to prove a conspiracy). For example, Reyes testified that in 1996 or 1997 he began purchasing marijuana from Mathias, and in 1997 or 1998 he also began purchasing distributable amounts of cocaine.[4] Reyes further testified that Mathias would always "front" the drugs to him, meaning that Mathias would give Reyes the marijuana or cocaine, and Reyes would sell some, keep some for himself and pay Mathias back with the proceeds of his own drug sales. This continued until February 2002, just before Mathias's arrest.

---

[4]Reyes testified that he started out purchasing marijuana from Mathias in half-pound quantities. As time went on, he began purchasing marijuana from Mathias in larger quantities–one pound, two pounds or three pounds. In addition, Reyes testified that he usually purchased cocaine from Mathias in one-ounce quantities, but that he also made purchases in two- or three-ounce quantities.

In addition, Leal and Quijas testified that they distributed cocaine and marijuana to Mathias beginning in 1997 until around 2000. Altogether, they delivered approximately 8 to 10 kilograms of cocaine and 150 pounds of marijuana to Mathias. After Leal had problems collecting from Mathias, Leal's source, Ledesma, began dealing with Mathias directly. Mathias then met Ramos-Santos through Ledesma. Ramos-Santos testified that after Ledesma was arrested in February 2000, he and Mathias agreed that he would sell drugs to Mathias. Between February 2000 and March 2001, Ramos-Santos sold approximately two and one-half kilograms of cocaine and 150 pounds of marijuana to Mathias.

Accordingly, we conclude that there is ample evidence to support a reasonable juror's finding that Mathias had ongoing agreements with Reyes, Leal, Quijas, Ramos-Santos and Ledesma for the common purpose of distributing cocaine and marijuana, and we affirm his drug-conspiracy conviction.

### b.     Variance

Next, Mathias contends that the evidence fails to prove a single, over-arching drug conspiracy as charged in the indictment. "A variance results where a single conspiracy is charged but the evidence at trial shows multiple conspiracies." *United States v. Morales*, 113 F.3d 116, 119 (8th Cir. 1997). However, we will reverse only if the variance infringed a defendant's substantial rights. *United States v. Ghant*, 339 F.3d 660, 662 (8th Cir. 2003). A defendant's substantial rights are infringed where: "(1) the defendant could not reasonably have anticipated from the indictment the evidence to be presented against him; (2) the indictment is so vague that there is a possibility of subsequent prosecution for the same offense; or (3) the defendant was prejudiced by a 'spillover' of evidence from one conspiracy to another." *United States v. Jones*, 880 F.2d 55, 66 (8th Cir. 1989).

It is somewhat unclear from his brief, but Mathias appears to argue that he was prejudiced by a spillover of evidence from one conspiracy to another. This argument is without merit. Assuming without deciding that the facts of his case show multiple drug conspiracies rather than one, the evidence clearly shows that Mathias participated in each of the conspiracies. In a case where the evidence shows that the defendant was a member of each proven conspiracy, the danger of prejudicial spillover "is minimal, if not non-existent." *United States v. Scott*, 511 F.2d 15, 20 (8th Cir. 1975); *see also Ghant*, 339 F.3d at 664 ("[The defendant] has cited no case in which, despite evidence that the defendant participated in all of the conspiracies, a variance between the number of conspiracies charged and the number proven was found to have prejudiced the defendant.").

Therefore, we will not reverse Mathias's drug-conspiracy conviction on the basis of a variance between the indictment and the evidence. Even assuming a variance did in fact exist, Mathias's substantial rights were not infringed.

### c. Other Purported Trial Errors

Mathias argues that the district court committed five trial errors. He contends that: (1) he did not have sufficient time to review certain material under the Jencks Act, 18 U.S.C. § 3500; (2) evidence of his nephew's involvement in the drug conspiracy should not have been admitted; (3) the district court failed to produce a witness he needed; (4) the district court improperly excluded witness testimony regarding a co-conspirator's prior inconsistent statements; and (5) the Government improperly housed Government witnesses together. Rule 28(a)(9) of the Federal Rules of Appellate Procedure provides that an appellant must give reasons supporting the contentions presented in his brief and must provide citations to the authorities and parts of the record on which he relies. Mathias's briefing of these issues fails to comport with this rule. In his entire discussion of all five issues, he cites the record only three times, cites only one case and barely provides any reasoning supporting his

contentions. Therefore, we conclude that Mathias has abandoned these issues. *See United States v. Gonzales*, 90 F.3d 1363, 1370 (8th Cir. 1996).

### 2.      Jessica Pizano

#### a.      Sufficiency of the Evidence

Jessica challenges the sufficiency of the evidence supporting her convictions on Counts 8 and 9 for bank fraud in violation of 18 U.S.C. § 1344 and her convictions on Counts 10 and 12 for engaging in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957. "In reviewing the denial of a motion for acquittal on the ground of insufficiency of the evidence, we review the evidence in the light most favorable to the verdict, and reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Howard*, 235 F.3d 366, 373 (8th Cir. 2000). "[We] will reverse only if the jury must have had a reasonable doubt concerning one of the essential elements of the crime." *United States v. Sandifer*, 188 F.3d 992, 995 (8th Cir. 1999).

#### i.      Bank Fraud

For Jessica to be convicted of bank fraud under § 1344, the Government had to prove that she knowingly executed or attempted to execute "a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. In *Neder v. United States*, 527 U.S. 1, 25 (1999), the Supreme Court held that "materiality of falsehood" is an element of the federal bank fraud statute. Jessica principally challenges the sufficiency of the evidence offered to support the materiality element of § 1344.

Jessica was convicted on Count 8 for bank fraud in connection with her application for a loan from Mercantile Bank that was to be secured by the Grant Street property. Viewed in the light most favorable to the verdict, the evidence shows that in her loan application to Mercantile Bank, she misrepresented that she was the sole owner of the property located at 162 Fourth Avenue in Moline and that such property was worth $65,000. She also misrepresented the purpose of the loan. In a letter to the bank, she explained that she wanted to obtain funds to purchase a home for Mathias in San Antonio, Texas, where he had taken a job. However, one week after the loan proceeds from the Grant Street refinancing were deposited into Jessica's IHMVCU account, the funds were used to purchase a home for Mathias on Parkway in Bettendorf, Iowa.

Jessica was convicted on Count 9 for bank fraud in connection with her application for the Lake Street mortgage with World Savings Bank. Viewed in the light most favorable to the verdict, the evidence shows that in her mortgage application to World Savings Bank, Jessica misrepresented that the source of the down-payment for Lake Street was a gift from her father. Mr. Pizano testified that although he signed a $15,000 gift letter, he only agreed to loan Mathias and Jessica $7,700 for the purchase of Lake Street. He also testified that he did not sign the $35,000 gift letter that Jessica submitted to World Savings Bank.

On appeal, Jessica argues that any misrepresentations she may have made were not material to Mercantile Bank's and World Savings Bank's respective decisions to approve her loan applications. She maintains that the value of the 162 Fourth Avenue property, the location of the property ultimately purchased for Mathias with the proceeds of the Grant Street refinancing, and the source of the down-payment for Lake Street (whether from savings or a gift) were not material factors in the underwriting process. We do not agree.

Jessica's argument fails because it misconstrues the materiality element of bank fraud by improperly injecting a reliance requirement into the analysis. Under the bank fraud statute, the Government need not prove that the financial institution actually relied on the defendant's misrepresentations. *See Neder*, 527 U.S. at 24-25. Like the defendants in *United States v. Kenrick*, Jessica

> mistake[s] the character of the falsehood required for [a bank fraud] conviction by arguing, in effect, that it must have actually induced the bank to make a loan that would not otherwise have been made. On the contrary, to be criminally fraudulent, a defendant's deceptive course of conduct must be material and it must be directed at obtaining money or other property from the bank, but there is no requirement that it actually cause the bank to change its behavior. A falsehood can be material even if it did not in fact induce the bank to alter its conduct, although if such alteration did occur it is obviously probative of materiality.

221 F.3d 19, 31-32 (1st Cir. 2000) (citations and footnote omitted). "The materiality inquiry focuses on whether the false statement had a natural tendency to influence or was capable of influencing the [financial institution]." *United States v. Rashid*, 383 F.3d 769, 778 (8th Cir. 2004) (internal quotation omitted).

Therefore, whether the banks actually relied on certain of Jessica's misrepresentations is not the issue.[5] Rather, viewing the record in the light most favorable to the verdict, a reasonable jury could find that Jessica engaged in a deceptive course of conduct, which centered on representing herself as the true owner of Parkway and Lake Street in order to obtain loans for her brother Mathias, a drug dealer, and that such deception had a natural tendency to influence or was capable of influencing the banks. We reject Jessica's sufficiency-of-the-evidence challenge, and we affirm her bank-fraud convictions.

---

[5]Nonetheless, there is evidence in the record that the banks did, in fact, rely on the truthfulness of those representations in approving Jessica's loans.

### ii. Engaging in Monetary Transactions in Criminally Derived Property

"A conviction under § 1957 requires a showing that: (1) defendant knowingly engaged in a monetary transaction; (2) the defendant knew that the property involved derived from specified unlawful activity; and (3) the property is of a value greater than $10,000." *United States v. Van Brocklin*, 115 F.3d 587, 599 (8th Cir. 1997).

Jessica was convicted of engaging in a monetary transaction of more than $10,000 of criminally derived property for issuing a check on her IHMVCU account in the amount of $40,500 for the purchase of the Lake Street condominium. She was convicted on another count of the same offense for wiring funds from her Mercantile Bank account in the amount of $53,450 for the purchase of the PCH condominium. Jessica argues that the evidence was insufficient to convict her on these counts because there was no proof that the down-payments were in fact derived from specified unlawful activity. She also seems to challenge the sufficiency of the evidence establishing that she knew the funds were criminally derived.

Specifically, Jessica contends that there is no competent evidence in the record to show that the funds for the down-payments came from Mathias and were, therefore, proceeds of his drug-trafficking activities. Rather, she argues, the record shows that the money she accumulated to purchase the Lake Street and PCH condominiums came from legitimate sources–for example, her employment with Oscar Mayer, the repair and sale of automobiles, rental income and hairstyling.

We reject this argument because the Government is not required to trace funds to prove a violation of § 1957. *United States v. Hetherington*, 256 F.3d 788, 794 (8th Cir. 2001). The Government produced evidence showing that Jessica

was the purchaser and owner of the California properties in name only. Mathias was the one who actually selected the properties and negotiated their purchase. The evidence supports the conclusion that Jessica could not have saved up enough funds from her personal income to make the sizable down-payments. The evidence also shows that Mathias was a drug dealer whose business generated large amounts of cash. These facts, along with evidence of large cash deposits into Jessica's IHMVCU and Mercantile Bank accounts in the weeks prior to the Lake Street and PCH closings, constitute sufficient evidence from which a reasonable jury could conclude that Mathias was the source of the down-payments which came from his drug-dealing activities.

In addition, the evidence was sufficient for the jury to infer knowledge on the part of Jessica. The Government provided evidence that as early as 1992, the police informed Jessica that Mathias's home had been raided for drugs. In addition, Jessica misrepresented the source of the down-payments by providing false gift letters from her father. Based on this evidence, the jury could infer that Jessica knew that the funds deposited into her accounts for the purchase of the California properties were criminally derived. *See United States v. Wynn*, 61 F.3d 921, 927 (D.C. Cir. 1995) ("We believe that Wynn's course of dealings with Edmond and Lewis dating back to March 1987–in which they made cash purchases of nearly a half-million dollars worth of merchandise and he attempted to disguise the source of that cash–supports the jury's inference that Wynn knew or was willfully blind to the fact that the cash involved in this particular transaction was criminally derived.").

Accordingly, we reject Jessica's sufficiency-of-the-evidence challenge, and we affirm her convictions on Counts 10 and 12.

### b. Variance

Next, Jessica argues that a variance between Count 9 of the indictment and the proof at trial entitles her to a new trial. Count 9 charged Jessica with bank fraud on World Savings Bank in connection with her application for a mortgage to purchase the Lake Street condominium. Count 9 misidentified the bank from which she made the down-payment for the Lake Street condominium as Mercantile Bank, when in fact, the evidence at trial established that the down-payment came from her account at IHMVCU. Count 9 also misidentified the recipient of the down-payment as World Savings Bank, rather than the escrow company.

"A variance that does not result in actual prejudice to the defendant is harmless error, and does not require reversal of the conviction." *United States v. Stuckey*, 220 F.3d 976, 979 (8th Cir. 2000). "A variance between charge and proof can affect the substantial rights of a defendant in a criminal case if the effect of the variance is to prevent the defendant from presenting his defense properly, or if it takes him unfairly by surprise, or if it exposes him to double jeopardy." *United States v. Good Shield*, 515 F.2d 1, 2 (8th Cir. 1975). Whether a variance prejudiced the defendant is a question of law that we review de novo. *Stuckey*, 220 F.3d at 979.

Jessica's variance argument is without merit because she fails to point to any resulting prejudice to her case. *See United States v. Reece*, 547 F.2d 432, 435 (8th Cir. 1977) (holding that defendant's variance argument was frivolous because although he alleged that the error was significant, the defendant failed to point to any prejudice to his case as a result of the error). After reviewing the record, we conclude that the noted variance did not take Jessica by surprise, prevent her and her counsel from preparing and presenting her case, or expose her to double jeopardy. *See Good Shield*, 515 F.2d at 3. Count 9 involved bank fraud on World Savings Bank. The indictment misstated the name of the bank from which the down-payment was made,

not the bank upon which the fraud was perpetrated.  The variance was harmless, and reversal of Jessica's conviction on Count 9 is therefore unwarranted.

### c.    Bank-Fraud Instruction

Next, Jessica contends that the district court improperly instructed the jury regarding the offense of bank fraud.[6]  Specifically, she argues that the definition of "scheme to defraud" in the instruction failed to include the element of intent which is necessary for a bank-fraud conviction.  Therefore, she argues, the definition made

---

[6]The district court instructed the jury that the crime of bank fraud has three essential elements:

> *One*, the defendant knowingly executed a scheme to defraud a financial institution to obtain monies, funds, assets or other property owned by or under the custody and control of a financial institution by means of material falsehoods, fraudulent pretenses, false or fraudulent representations or promises;
>
> *Two*, the defendant did so with intent to defraud; and
>
> *Three*, the financial institution was insured by the United States Government.

The instruction defined "scheme to defraud" as "any plan or course of action intended to deceive or cheat another out of money or property by employing material falsehoods, concealing material facts, or omitting material facts.  It also means the obtaining of money or property from a financial institution by means of material false representations or promises."  The instruction further provided:  "To act with an 'intent to defraud' means to act knowingly and with the intention or purpose to deceive or to cheat.  An intent to defraud is accompanied ordinarily by a desire or purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person."

a violation of 18 U.S.C. § 1344 (bank fraud) indistinguishable from a violation of 18 U.S.C. § 1014 (false statements to a bank). We do not agree.

A district court has wide discretion when instructing the jury. *United States v. Wright*, 246 F.3d 1123, 1128 (8th Cir. 2001). On appeal, we view the instructions as a whole, and we will affirm if the instructions "accurately and adequately state the applicable law." *United States v. Clapp*, 46 F.3d 795, 803 (8th Cir. 1995).

Jessica's argument fails to consider the bank-fraud instruction as a whole. The instruction specifically stated that "intent to defraud" is an element of the offense, and it also defined the phrase. The instructions given on the elements of bank fraud and the definition of "scheme to defraud" followed the model jury instructions for this Circuit. *See* Eighth Cir. Manual of Model Crim. Jury Instructions 6.18.1344 (2002); *Feingold v. United States*, 49 F.3d 437, 439 (8th Cir. 1995). In addition, the definition of "intent to defraud" was the same definition upheld by this Court in *Clapp*. *See* 46 F.3d at 802-03 ("Taken together, the court's instructions on intent to defraud and the specific elements of the charged [bank-fraud] offense adequately informed the jury . . . ."). After reviewing the bank-fraud instruction as a whole, we conclude that the instruction properly and adequately conveyed to the jury the legal principles governing the offense.

### 3.    Celia

Celia challenges the sufficiency of the evidence supporting her conviction on Count 18 for engaging in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957. Count 18 relates to Celia's involvement with Mathias's purchase of the Christie Street property. Specifically, she argues that there was no evidence of an intent to conceal or deceive on her part that would support the conviction.

This argument fails because a conviction under § 1957 "does not require that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design." *Wynn*, 61 F.3d at 926-27 ("Due to the omission of a 'design to conceal' element, section 1957 prohibits a wider range of activity than money 'laundering,' as traditionally understood."). Therefore, we affirm Celia's conviction on Count 18.

### 4. Conspiracy to Commit Money Laundering

Mathias, Jessica and Celia argue that the evidence produced at trial by the Government is insufficient to support their convictions for conspiracy to commit money laundering. We do not agree.

"The elements of a § 1956(a)(1)(B)(i) money laundering violation are: (1) that the defendant conducted a financial transaction involving the proceeds of unlawful activity; (2) that the defendant knew the proceeds involved in the transaction were the proceeds of an unlawful activity; and (3) that the defendant intended 'to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'" *United States v. Dugan*, 238 F.3d 1041, 1043 (8th Cir. 2001) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)). "[T]he purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." *United States v. Rounsavall*, 115 F.3d 561, 565 (8th Cir. 1997) (internal quotations omitted).

To convict a defendant of conspiracy to launder money, the Government must prove that the defendant "knowingly joined a conspiracy to launder money and that one of the conspirators committed an overt act in furtherance of that conspiracy." *United States v. Evans*, 272 F.3d 1069, 1082 (8th Cir. 2001). "At base, there must

exist an agreement to achieve an illegal purpose." *Id.* A conspiratorial agreement "need not be formal; a tacit understanding will suffice." *United States v. Sparks*, 949 F.2d 1023, 1027 (8th Cir. 1991). "Moreover, the government may prove the agreement wholly by circumstantial evidence or by inference from the actions of the parties." *Id.* (citations omitted).

Mathias and Celia contend that the evidence is insufficient to establish the existence of an agreement among themselves and Jessica or any other persons. We do not agree. We conclude that ample evidence was produced at trial from which a reasonable jury could infer an agreement between Mathias, Celia and Jessica to launder the proceeds of Mathias's illegal drug-trafficking activity. For example, the record supports a finding that Mathias, Jessica and Celia had a tacit understanding to conceal that Mathias was the true owner of the Lake Street and PCH condominiums and that the proceeds used to purchase the properties were obtained from his drug dealing.

Jessica argues that her money-laundering conviction should be reversed because there is insufficient evidence in the record to show that she knew or should have known Mathias was involved in the distribution of controlled substances. This argument also fails. For the same reasons discussed in Jessica's sufficiency-of-the-evidence challenge to her conviction under § 1957 (for example, as early as 1992 the police informed Jessica that Mathias's home had been raided for drugs), the jury could infer that Jessica knew that the funds deposited into her accounts for the purchase of the California properties were criminally derived. *See Wynn*, 61 F.3d at 927.

Accordingly, we reject this challenge to the sufficiency of the evidence, and we affirm Mathias's, Jessica's and Celia's convictions on Count 20 for conspiracy to commit money laundering.

**B.      Sentencing Issues**

**1.      Jessica**

Under § 2S1.1(a)(2) of the United States Sentencing Guidelines (the "guidelines"), the base offense level for a third party money-launderer is "8 plus the number of offense levels in the table in § 2B1.1 . . . corresponding to the value of the laundered funds."   U.S. Sentencing Guidelines Manual § 2S1.1(a)(2) (2003). "'Laundered funds' means the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957." U.S.S.G. § 2S1.1, cmt. n.1.

At sentencing, the district court did not aggregate each layer of Jessica's money-laundering offense to determine the value of the laundered funds attributable to her.  Using this approach, the district court found that the value of the laundered funds with respect to Jessica was $226,173.06, which added 12 levels to her base offense level of eight based on the table in § 2B1.1.

The district court also applied a two-level enhancement for "sophisticated laundering" under § 2S1.1(b)(3).  "'[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the [money-laundering] offense." U.S.S.G. § 2S1.1, cmt. n.5(A).  It "typically involves the use of (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts."  *Id.*   The district court imposed the enhancement because it found "substantial layering" by Jessica.  The court explained, "Defendant [Jessica] used numerous small cash deposits, some on the same days, then wrote checks to her mother, who obtained cashier's checks to return the money to Jessica."  The district

court concluded, "The flow of cash into and out of various accounts of Ms. Pizano indicates a distinct effort to evade federal cash transaction reporting requirements and an attempt . . . through multiple transactions, to hide large quantities of cash being deposited into her account."

The district court applied a six-level enhancement under § 2S1.1(b)(1) for knowingly laundering the proceeds of a controlled-substance offense. The district court also added two levels under § 3C1.1 for obstruction of justice, finding that Jessica lied on the stand during trial and violated a restraining order. Finally, the district court added another two levels under § 2S1.1(b)(2)(B) because Jessica was convicted of an offense under 18 U.S.C. § 1956. Jessica's resulting total offense level was 32, which yielded a guidelines range of 121 to 151 months' imprisonment based on her criminal history category of I. The district court imposed concurrent sentences of 121 months' imprisonment on Counts 8, 9, 11 and 20, and 120 months' imprisonment on Counts 10 and 12.[7]

On appeal, the Government argues that the district court erred in its application of § 2S1.1(a)(2) because it did not aggregate each layer of Jessica's money-laundering offense in determining the value of the laundered funds for purposes of her base offense level. Specifically, the Government contends that in a money-laundering offense involving layering, the "value of the laundered funds" is the aggregate total of the funds involved in each layer, not the amount originally derived from criminal activity and then laundered. The Government argues that using the aggregate approach, the value of the laundered funds involved in Jessica's money-laundering offense would exceed one million dollars, which, according to the table in § 2B1.1, would add 16, rather than 12, to Jessica's base offense level.

_____

[7]Counts 10 and 12 carried a ten-year maximum sentence.

In addition to the Government's challenge to the district court's interpretation and application of § 2S1.1(a)(2), Jessica raises a *Blakely/Booker* argument. We reject the Government's argument that the district court should have used the aggregate approach in applying § 2S1.1(a)(2). We also conclude that Jessica's *Blakely/Booker* argument fails.

### a. "Value of the Laundered Funds" Under § 2S1.1

After *Booker*, "we will continue to examine de novo whether the district court correctly interpreted and applied the guidelines." *United States v. Mashek*, 406 F.3d 1012, 1016-17 (8th Cir. 2005). Section 2S1.1 was amended extensively in 2001. Analyzing the 2001 amendments to § 2S1.1, we conclude that the district court did not err, and we hold that in a money-laundering offense involving layering, the "value of the laundered funds" is the amount originally derived from criminal activity and then laundered, not the aggregate total of the funds involved in each layer.

In the pre-amended version of § 2S1.1, the "value of the funds"[8] was a specific offense characteristic used to enhance a defendant's base offense level. According to the commentary on the pre-amended version of § 2S1.1, the value of the funds was "an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise." U.S.S.G. § 2S1.1, cmt. background. For example, in *United States v. Martin*, 320 F.3d 1223, 1226 (11th Cir. 2003), the Eleventh Circuit held that under the pre-amended version of § 2S1.1, the value of the funds should not be strictly limited to funds originally injected or infused into the money-laundering scheme. Rather, the court reasoned that layered transactions should be aggregated to determine the value of the funds because such a calculation accurately reflects the scope of the criminal enterprise and the harm that befalls society when law enforcement's efforts to track the ill-gotten gains are impeded. *Id.*

---

[8]The amended version uses the term "value of the laundered funds."

at 1227.  The court in *United States v. Li*, 973 F. Supp. 567, 574 (E.D. Va. 1997), reached the same holding and concluded that adding the value of funds in each layer "would be an accurate indicator of the magnitude of the criminal enterprise in which [the defendant] was involved."  Lastly, in another case which did not address the specific issue of aggregation, the Fifth Circuit examined the term "value of the funds" under the pre-amended version of § 2S1.1 and opined that "[s]ection 2S1.1 measures the harm to society that money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains."  *United States v. Allen*, 76 F.3d 1348, 1369 (5th Cir. 1996).

In contrast, after the 2001 amendments to § 2S1.1, the "value of the laundered funds" is no longer a specific offense characteristic.[9]  "Instead, the base offense level for money laundering is determined by reference to the underlying offense from which the laundered funds were derived, or by reference to the chart in § 2B1.1 corresponding to the 'value of the laundered funds.'"  *Martin*, 320 F.3d at 1227 n.3; *see* § 2S1.1(a).  The amended guideline also contains several new specific offense characteristics, for example, a six-level enhancement for knowingly laundering the proceeds of certain offenses and a four-level enhancement for being in the business of laundering funds.  *See* § 2S1.1(b)(1), (2).  The most telling addition, for purposes of the present issue, is the enhancement for "sophisticated laundering," which is defined as "complex or intricate offense conduct pertaining to the execution or concealment of the [money-laundering] offense."  *See* § 2S1.1(b)(3); U.S.S.G. § 2S1.1, cmt. n.5(A).  The stated reason for the added enhancement is that offenses involving sophisticated laundering "warrant additional punishment because such offenses are more difficult and time consuming for law enforcement to detect than less sophisticated laundering."  U.S.S.G. app. C.

---

[9]In the pre-2001 version of § 2S1.1, the "value of the funds" was a specific offense characteristic.  In addition, the fact that the defendant knew or believed the funds were proceeds of a controlled-substance offense was the only other specific offense characteristic that could be used to enhance a defendant's base offense level.

The 2001 amendments to § 2S1.1 convince us that the "value of the laundered funds" should be limited to funds originally injected or infused into the money-laundering scheme. The "value of the laundered funds" is no longer the only factor reflecting the magnitude of the criminal enterprise. Magnitude also is reflected in the specific offense characteristics that were added to the guideline. Specifically, the sophisticated-laundering enhancement now accounts for the harm that befalls society when law enforcement's efforts to track the ill-gotten gains are impeded by layering. Aggregation is no longer necessary to account for that harm. *See Martin*, 320 F.3d at 1227 n.3 ("[A]lthough the district court properly aggregated the funds from layered transactions in determining the 'value of the funds' under § 2S1.1(b)(2) of the 1998 Guidelines, it might be improper for a district court to do so when determining the 'value of the laundered funds' under § 2S1.1(a)(2) of the 2001 Guidelines because § 2S1.1(b)(3) of the 2001 Guidelines provides for a two level increase for 'sophisticated laundering.'").

Accordingly, we conclude that the district court did not err in its application of § 2S1.1(a)(2), and the Government's cross-appeal on this issue is, therefore, denied.

### b. *Blakely/Booker*

Jessica argues that her sentence, pronounced under a mandatory application of the guidelines, is erroneous under *United States v. Booker*, 125 S. Ct. 738 (2005). Before the district court, Jessica did not argue *Apprendi* or *Blakely* error with respect to her sentencing or that the guidelines were unconstitutional. Therefore, we review her sentence for plain error. *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc).

We apply the plain-error test as set forth in *United States v. Olano*, 507 U.S. 725, 732-36 (1993). The test has been stated as follows:

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Pirani*, 406 F.3d at 550 (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)) (internal quotation omitted).

As in *Pirani*, the first two factors are satisfied because the district court committed error in applying the guidelines in a mandatory fashion, and the error is plain at the time of appellate consideration. *See Pirani*, 406 F.3d at 550. To satisfy the third *Olano* factor, Jessica must demonstrate "a reasonable probability that [she] would have received a more favorable sentence with the *Booker* error eliminated by making the Guidelines advisory." *Id.* at 551. We have reviewed the record, and we conclude that there is nothing to indicate a reasonable probability that Jessica would have received a more favorable sentence but for the *Booker* error.

Accordingly, we affirm Jessica's sentence.

### 2.    Celia

As with Jessica, the district court did not aggregate each layer of Celia's money-laundering offense to determine the value of the laundered funds attributable to her under § 2S1.1(a)(2) of the guidelines. Using this approach, the district court

found that the value of the laundered funds with respect to Celia was $404,704.63,[10] which added 14 levels to her base offense level of eight based on the table in § 2B1.1.

The district court also applied a two-level enhancement for "sophisticated laundering" under § 2S1.1(b)(3), finding "substantial layering" by Celia. In addition, the district court applied a six-level enhancement under § 2S1.1(b)(1) for knowingly laundering the proceeds of a controlled-substance offense. Finally, the district court added another two levels under § 2S1.1(b)(2)(B) because Celia was convicted of an offense under 18 U.S.C. § 1956.

Celia's resulting total offense level was 32, which yielded a guidelines range of 151 to 188 months' imprisonment based on her criminal history category of III. The district court imposed concurrent sentences of 151 months' imprisonment on Counts 2, 3, 4, 5, 6, 7, 15 and 20, and 120 months' imprisonment on Count 18.[11]

On appeal, the Government argues, as it did with respect to Jessica's sentence, that the district court erred in its application of § 2S1.1(a)(2) because it did not aggregate each layer of Celia's money-laundering offense in determining the value of the laundered funds for purposes of her base offense level. Specifically, the Government contends that using the aggregate approach, the value of the laundered funds involved in Celia's money-laundering offense would exceed one million

_____

[10]The district court arrived at the $404,704.63 figure as follows: (1) $3,500 earnest money for the purchase of the Lake Street condominium; (2) $5,000 earnest money for the purchase of the PCH condominium; (3) $9,000 for the purchase of the PCH condominium; (4) $14,676.44 for the purchase of the Christie Street property; (5) deposits to the Caliente Restaurant account in the amount of $74,000; (6) American Express payments totaling $70,546.19; (7) cash deposits to her bank account totaling $37,129; (8) $149,303 from the purchase of vehicles; and (9) $41,550 for the purchase of the Lake Street condominium.

[11]Count 18 carried a ten-year maximum sentence.

dollars, which, according to the table in § 2B1.1, would add 16, rather than 14, to Celia's base offense level. For the reasons we discuss in Section B.1.a, we conclude that the district court did not err in its application of § 2S1.1(a)(2), and the Government's cross-appeal on this issue is denied.

Celia raises three challenges to her sentence. First, she argues that the district court erred in calculating the value of the laundered funds attributable to her. She also argues that the district court should not have applied the sophisticated-laundering enhancement. Lastly, Celia raises a *Blakely/Booker* argument.

### a. "Value of the Laundered Funds" Calculation

Celia disputes the following amounts included in the district court's determination of the value of the laundered funds attributable to her: (1) deposits to the Caliente Restaurant account in the amount of $74,000; (2) American Express payments totaling $70,546.19; and (3) $41,550 for the purchase of the Lake Street condominium. After *Booker*, we continue to review the district court's findings at sentencing for clear error. *Mashek*, 406 F.3d at 1016-17. We have examined each of Celia's claims, and in light of our standard of review, we conclude that the district court's findings were not clearly erroneous.

### b. Sophisticated-Laundering Enhancement

Celia challenges the two-level enhancement imposed by the district court for "sophisticated laundering" under § 2S1.1(b)(3). As we noted, "'sophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the [money-laundering] offense." U.S.S.G. § 2S1.1, cmt. n.5(A). The district court imposed the enhancement because it found "substantial layering" by Celia. The court explained, "The flow of cash into and out of various of Celia's accounts indicates a distinct effort to evade federal cash transaction reporting

requirements and an attempt, through multiple transactions, to hide large quantities of cash being deposited into her accounts. Celia participated in numerous vehicle transactions and frequently moved money from her own accounts to those of her daughter."

Celia contends that there was nothing complex or sophisticated in the way she moved funds between accounts or in the purchase of cashier's checks. Specifically, she argues that numerous simple transactions do not equate to complex conduct. Celia does not dispute the findings underlying the district court's conclusion that she engaged in layering. Rather, she challenges the district court's application of § 2S1.1(b)(3) to its findings. Therefore, we review de novo whether the district court correctly applied the guidelines when it determined that its findings constituted sophisticated laundering. *See United States v. Finck*, 407 F.3d 908, 913 (8th Cir. 2005) (in a fraud case, conducting de novo review of whether the district court correctly applied the guidelines when it determined the facts constituted sophisticated means under U.S.S.G. § 2B1.1(b)(1)(8)).

Under the plain language of § 2S1.1, layering constitutes sophisticated laundering. *See* U.S.S.G. § 2S1.1, cmt. n.5(A) (noting that sophisticated laundering "typically involves the use of . . . layering"); *see also United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) ("When an individual attempts to launder money through 'two or more levels of transactions,' the commentary clearly subjects an individual to the sophisticated laundering enhancement."). The guideline does not require a finding that each layer was composed of a complex transaction. Therefore, because the district court found that Celia engaged in layering and she does not dispute that finding, we conclude that the district court did not err in applying the sophisticated laundering enhancement.

### c.    *Blakely/Booker*

Lastly, Celia argues that her sentence, pronounced under a mandatory application of the guidelines, is erroneous under *Booker*.  Like Jessica, Celia failed to preserve the issue, and therefore, we review her sentence for plain error.  *Pirani*, 406 F.3d at 549 (8th Cir. 2005).

As we concluded in Jessica's case, the third *Olano* factor has not been met because Celia has failed to demonstrate "a reasonable probability that [she] would have received a more favorable sentence with the *Booker* error eliminated by making the Guidelines advisory."  *Id.* at 551.  We have reviewed the record, and there is nothing to indicate a reasonable probability that Celia would have received a more favorable sentence but for the *Booker* error.

Accordingly, we affirm Celia's sentence.

### 3.    Mathias

Based on the quantity of drugs found by the jury, Mathias's base offense level for the drug-conspiracy conviction was 32.  The district court credited the trial testimony of Leal and applied a two-level enhancement under § 2D1.1(b)(1) for possession of a dangerous weapon during the drug offense.  Another two levels were added under § 2S1.1(b)(2)(B) because Mathias was convicted of an offense under 18 U.S.C. § 1956.  The district court also applied a two-level enhancement under § 3C1.1 for obstruction of justice, finding that Mathias attempted to place a "hit" on the prosecutor and that he assaulted a cooperating Government witness.  In addition, the district court applied a four-level enhancement under § 3B1.1(a) for Mathias's role as an organizer or leader of a criminal activity that involved five or more participants.  Finally, the district court denied a two-level enhancement for sophisticated laundering under § 2S1.1(b)(3).

Mathias's resulting total offense level was 42, which yielded a guidelines range of 360 months' to life imprisonment based on his criminal history category of I. The district court imposed concurrent sentences of 360 months' imprisonment on Counts 1, 13 and 16; 240 months' imprisonment on Counts 19 and 20; and 120 months' imprisonment on Counts 14, 17 and 18.

Mathias and the Government both raise challenges to the sentence imposed by the district court. Mathias argues that the district court erred in applying the dangerous-weapon enhancement under § 2D1.1(b)(1) and the leadership-role enhancement under § 3B1.1(a). The Government argues that the district court erred in denying the sophisticated-laundering enhancement under § 2S1.1(b)(3). Finally, Mathias raises a *Blakely/Booker* argument.

"We review the district court's factual findings for clear error, and its interpretation and application of the guidelines *de novo*." *United States v. Noe*, 411 F.3d 878, 888 (8th Cir. 2005) (citing *Mashek*, 406 F.3d at 1020).

### a. Dangerous-Weapon Enhancement

"Section 2D1.1(b)(1) mandates a two-level enhancement if the Government can prove by a preponderance of the evidence that the defendant possessed 'a dangerous weapon (including a firearm)' while violating 21 U.S.C. § 841(b)." *United States v. Savage*, 414 F.3d 964, 966 (8th Cir. 2005) (quoting § 2D1.1(b)(1)). The enhancement, which "reflects the increased danger of violence when drug traffickers possess weapons[,] . . . should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.3. "[T]he government need only prove a temporal and spatial nexus among the weapon, defendant and drug-trafficking activity." *United States v. Torres*, 409 F.3d 1000, 1003 (8th Cir. 2005).

The district court applied the enhancement, relying on Leal's trial testimony that Mathias showed him a gun during the course of one of their drug transactions at Mathias's house. Leal testified that Mathias got the gun out of a hall closet and

> [H]e [Mathias] just show it to me and extend his hand and kind of hand it to me. So I grab it just for a few seconds and give it back to him, and I ask him if . . . it was loaded. He say no. And then when he grabbed the gun back, he pulled the–the thing in the bottom, and it was loaded, like, with four bullets. Said, "Put that thing back," because, you know, you can get hurt.

Mathias argues that the district court erred in applying the enhancement because it was clearly improbable that the gun was connected with the drug transaction. Specifically, he contends that the incident amounted to nothing more than showing an acquaintance his gun. This argument is totally lacking in merit. Mathias's seemingly innocent characterization of the incident with Leal falls apart when placed in the context of § 2D1.1(b)(1). The fact that the "acquaintance" was one of Mathias's cocaine and marijuana suppliers and the fact that Mathias brandished a loaded gun to such an acquaintance during a drug buy, *see United States v. Lopez*, No. 04-2189, slip op. at 5 (8th Cir. Aug. 1, 2005) (noting the fact that the gun was loaded suggests that it was being kept ready for immediate or emergency use), constitute just the type of conduct § 2D1.1(b)(1) aims to address. The evidence clearly shows a temporal and spatial nexus among the gun, Mathias and drug-trafficking activity. The district court did not err.

### b. Leadership-Role Enhancement

Section 3B1.1(a) provides for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A "participant" is "a person who is

criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1. The enhancement "flows from the defendant's decision-making authority, type of participation in the offense, nature and scope of the crime, and the degree of control or authority over others." *Noe*, 411 F.3d at 889. Furthermore, the enhancement applies "even if the defendant's leadership role did not encompass all the participants." *United States v. Payne*, 119 F.3d 637, 646 (8th Cir. 1997).

The district court applied the enhancement, finding that Mathias organized and led Celia, Jessica and Kristine Martens in a conspiracy to launder money and that the following participants were also involved: Michael Pizano, Jennifer Pizano, Leal and Ramos-Santos. Mathias argues that the district court erred in applying the enhancement by improperly factoring in drug-conspiracy participants, such as Leal and Ramos-Santos. Mathias's argument fails because it relies on an inaccurate characterization of the district court's findings.

For example, the district court included Leal in its finding of "five or more participants" based on his involvement in the money-laundering activity. A preponderance of the evidence at trial showed that Mathias used a 1995 Chevy Tahoe, purchased with proceeds of his drug-trafficking activity and titled in Celia's name, to buy drugs from Leal. Mathias's drug-trafficking proceeds were further concealed in that county records show Jose and Rosemary Leal purchasing the Tahoe from Celia for $14,000.

We conclude that the district court did not clearly err in finding that Mathias organized and led Celia, Jessica and Kristine Martens in a conspiracy to launder money. We also conclude that the district court's finding that Leal was a participant in the money-laundering activity was not clearly erroneous. Therefore, the district court's enhancement of Mathias's sentence under § 3B1.1(a) was proper

because Mathias was an organizer or leader of a criminal activity that involved at least five participants.

### c.    Sophisticated-Laundering Enhancement

The Government takes issue with the fact that despite applying the sophisticated-laundering enhancement to Jessica and Celia, who, as the district court found, were organized and led by Mathias in the money-laundering conspiracy, the district court inexplicably denied application of the enhancement to Mathias.  The denial was based on the district court's findings that National Retainment Systems and the Caliente Restaurant were not "fictitious entities" and that Mathias's conduct in the scheme amounted to typical money-laundering activities.  We cannot say that the court's finding on fictitious entities is clearly erroneous.  However, we do conclude that the district court erred in its application of the guidelines by failing to apply § 1B1.3 to determine whether Mathias should be held accountable for Jessica's and Celia's "layering" activities.  We remand to the district court to make this determination.[12]

Section 1B1.3(a)(1)(B) provides that "in the case of a jointly undertaken criminal activity," a defendant is responsible for "all reasonably foreseeable acts or omissions of others in furtherance of the jointly undertaken criminal activity." "Accordingly, a defendant convicted of conspiracy is properly held accountable for all reasonably foreseeable acts of co-conspirators advancing that conspiracy." *United States v. Bad Wound*, 203 F.3d 1072, 1076 (8th Cir. 2000).  "Factors relevant to foreseeability include whether the defendant benefitted from his co-conspirator's

---

[12]We must remand because the district court's incorrect application of the guidelines was not harmless.  *See Mashek*, 406 F.3d at 1018.  If the 2-level sophisticated-laundering enhancement is applied, Mathias's recommended sentence under the guidelines is life imprisonment, rather than a range of 360 months' to life imprisonment.

activities and whether he demonstrated a substantial level of commitment to the conspiracy." *United States v. Brown*, 148 F.3d 1003, 1008 (8th Cir. 1998).

Unless the district court finds that Jessica's and Celia's layering activities were not reasonably foreseeable to Mathias in furtherance of the money-laundering conspiracy, a finding this Court cannot imagine, *see Miles*, 360 F.3d at 482 (applying the sophisticated-laundering enhancement to defendant after finding layering activities of co-conspirator reasonably foreseeable to the defendant), the enhancement should apply to Mathias.

## III. CONCLUSION

For the foregoing reasons, we affirm Mathias's, Jessica's and Celia's convictions. We also affirm Jessica's and Celia's sentences. However, we vacate Mathias's sentence and remand for resentencing consistent with this opinion and the Supreme Court's opinion in *Booker*.